# Richmond.

## WARREN v. COMMONWEALTH.

January 14, 1926.

1. HOMICIDE—*Murder in the Second Degree—Evidence Held Insufficient to Sustain Conviction—Case at Bar.*—In the instant case, a prosecution for murder, the evidence was insufficient to support a verdict of guilty. It but raised suspicion. All of the evidence for the Commonwealth might be true and yet the accused be not guilty, and notwithstanding the great weight which is properly attached to the verdict of a jury approved by the trial court, the Supreme Court of Appeals has from time to time found it necessary to set aside a verdict because of lack of evidence to support it.

2. CRIMINAL LAW—*Burden of Proof—Mere Suspicion—Case at Bar.*— Mere suspicion, however strong, will not support a verdict of guilty. The burden is on the Commonwealth to prove the guilt of the accused beyond a reasonable doubt. In the instant case, a prosecution for murder, there were some circumstances of suspicion, but there was no satisfactory evidence of the guilt of the accused. Suspicion cannot be substituted for proof, nor supply the place of evidence necessary to overcome the presumption of innocence, and for this reason the judgment of the trial court was reversed.

Error to a judgment of the Circuit Court of Prince George county.

*Reversed.*

The opinion states the case.

*Thomas H. Howerton,* for the plaintiff in error.

*John R. Saunders, Attorney General, Leon M. Bazile* and *Lewis H. Machen, Assistant Attorneys General,* for the Commonwealth.

BURKS, J., delivered the opinion of the court.

The accused was indicted jointly with Boy Raby for the murder of Craig Futrell, and on the trial of the accused he was found guilty of murder of the second degree, and sentenced to the penitentiary for ten years. There were two trials of the case, but on the first trial the jury were unable to agree on a verdict and were discharged. At the second trial the accused offered no evidence in his own behalf, and he was convicted on testimony for the Commonwealth substantially as follows:

Warren, Raby and Futrell all came from the same place in North Carolina, where they had been friends, and it was said that Warren and Futrell were cousins. Warren and Raby had been working at Fargo, in Sussex county, Virginia, for some time previous to the homicide, but Futrell had just come from North Carolina to work at the same place in Fargo. All of them were negroes. On Saturday night, March 7, 1925, the three attended a party at the house of Jno. Henry Taylor, in the neighborhood. Futrell, who had been drinking, showed a disposition to create a disturbance, and Warren and Raby persuaded him to leave with them, with the intention of taking him home. They left the house together, and in about a half hour Warren and Raby returned without Futrell. The next morning Futrell's body was found cut in two on the tracks of the Norfolk and Western Railroad about two and a half miles east of Disputanta, in Prince George county. The coroner viewed the body, and, not deeming further investigation necessary, directed its burial.

Shortly thereafter, Warren and Raby were arrested by a special police officer of Prince George county, who testified that "the prisoners made certain statements to him," and that they were voluntary. The

accused admitted that he made the statements attrib-
uted to him, which were as follows: "That he went
to the dance at Jno. Henry Taylor's on the evening of
March 7th, in Prince George county, about two miles
or so from Fargo; that Craig Futrell and Boy Raby
accompanied him; that shortly after their arrival,
Craig Futrell, who had been drinking, as had both he
and Boy Raby, showed a disposition to create a dis-
turbance and said he was going to raise a rough-
house; that Will Warren, the accused, thereupon
remonstrated with Craig Futrell, who was his cousin,
so Warren informed the witness, and told him not
to have any row, as Taylor was all right and had
always treated him right, saying that he, Warren,
knew Craig Futrell well, both he and Boy Raby, and
that he, Boy Raby and Futrell all came from the same
place in North Carolina, and that Warren and Boy
Raby had been working at Fargo for some time pre-
viously but that Futrell had just come from North
Carolina to work at the same place in Fargo; that upon
his reproving Craig Futrell, Warren stated that he and
Boy Raby induced Futrell to leave with them, their
intention being to take him home; that they proceeded
on their way by the path by which they had come to
John Henry Taylor's, which path went from Taylor's
house to Sarah Green's house down to the Norfolk
and Western Railroad, through a wire fence to the
tracks of the Norfolk and Western Railroad, thence
down the track to Fargo; that shortly after passing
Sarah Green's house, Warren stated that Craig Futrell
suddenly turned on him and struck him and knocked
him down and got on him; that he called Boy Raby,
who was standing by, to pull him off; that Boy Raby
did this. Whereupon when he had gotten to his feet,
Craig Futrell cut him, Warren, in the head with a

knife and then ran down the path toward the railroad; that this was the last he saw of Futrell; that he, Warren and Boy Raby, went back immediately to John Henry Taylor's house with blood on his, Will Warren's head, and called for a basin of water which was furnished him by one of the women in the back room, and he washed the blood off his head; that he and Boy Raby stayed at the dance until it broke up, then went back to Fargo together, that they did not go back to Fargo by the path which they had come, which was the path by which they had attempted to carry Craig Futrell back before his altercation with him, but went another and longer way by the farm of Mr. J. H. Hatch.''

The justice of the peace who viewed the remains on March 8 also testified as follows: "That the witness, on the morning of March 8, 1925, in company with Will Warren, after the body of the deceased was found, was shown by Will Warren a place in a cornfield where signs of a struggle appeared on the ground; that Will Warren, the accused, voluntarily, and without constraint or inducement, said to witness that Craig Futrell, after the accused, Craig Futrell and Boy Raby had together left the party, attacked him, Will Warren, at this place; that witness noticed that corn was beaten down, and there were imprints on the ground and corn stalks were mashed down; that the witness discovered traces of blood on the ground; that this place was on the path leading from John Henry Taylor's house by Sarah Green's house down to the gap in the wire fence, on the Norfolk and Western Railroad, 212 yards from which said gap, on the tracks of said railway, the body was found; that the distance by this path from John Henry Taylor's house to Sarah Green's house, as stepped off by the witness, was 500 yards; that the distance by this path, as stepped off

by the witness, from Sarah Green's house down to the place in the cornfield where the apparent scene of the struggle was observed by the witness, was seventy-five yards; that from this point by the same path to another point in the woods where blood was also found in the grass, was 120 yards; that the distance from this point in the woods to the place where the body was found, was between 400 and 500 yards as estimated by the witness; that the distance from John Henry Taylor's house, by the same path, to which the body was found, was fifty-five yards less than three-fourths of a mile; that John Henry Taylor's house is situated to the south side of the railroad; that the witness does not know of his own knowledge whether there was foul play or how the deceased was killed; on cross-examination, being asked whether or not he could walk from said Taylor's house by the said path down to the place where the struggle appeared to have taken place in the cornfield, as aforesaid, and thence along the said path to the said gap in the wire fence, and thence down the track to the place where the body was found, and then back to John Henry Taylor's house by said path by which he had come, in half an hour, witness answered that he could not, and that if he did so he would have to trot mighty fast; * * * the witness further stated that on the railroad track near where the body was found there appeared to be marks of scuffling, and at this point, on a small three-cornered rock, the witness discovered some blood."

A week or more after the discovery of the body of Futrell, it was exhumed and an autopsy held. The body was found to be in an advanced stage of decomposition. The autopsy disclosed two wounds in the front part of the neck about an inch and a half apart, apparently bullet wounds, "penetrating the

neck, which, in the course of their progress, after an inch or so, united and pierced the heart by one common path;" that the necessary consequence of the wounds was instant death, and that they could not have been self-inflicted. They were not of such character as could have been made by a knife, a rock, or the train.

Two witnesses testified that they heard what they thought was a pistol shot in the direction of the railroad while Warren and Raby were absent.

One of the witnesses for the Commonwealth testified that "she did not hear Will Warren or Boy Raby have any altercation or fuss with Futrell; that they seemed to be friendly and disposed to get him away from the party."

[1] The evidence was not sufficient to support the verdict of the jury. It but raised a suspicion. All of the evidence for the Commonwealth may be true and yet the accused be not guilty.

Notwithstanding the great weight which is properly attached to the verdict of a jury approved by the trial court, this court has from time to time found it necessary to set it aside because of lack of evidence to support it. A few of the cases in which this has been done are cited by way of illustration of when it is proper to do so. *Grayson* v. *Com'th*, 6 Gratt. (47 Va.) 712; *Grayson* v. *Com'th*, 7 Gratt. (48 Va.) 613; *Tucker* v. *Com'th*, 88 Va. 20, 13 S. E. 298; *Tilley* v. *Com'th*, 90 Va. 99, 17 S. E. 895; *McBride* v. *Commonwealth*, 95 Va. 819, 30 S. E. 454; *Montgomery* v. *Com'th*, 98 Va. 840, 36 S. E. 371; *Same* v. *Same*, 98 Va. 852, 37 S. E. 1; *Montgomery* v. *Com'th*, 99 Va. 833, 37 S. E. 841; *Canter* v. *Com'th*, 123 Va. 794, 96 S. E. 284.

[2] We recognize the importance of the prompt and efficient enforcement of the criminal law of the State, and that a case should not be reversed by this court

for mere formal errors if it is possible to avoid it, but the error here complained of is not merely formal. It goes to the very merits of the case, and a certain degree of proof is required before a man can be deprived of his life or his liberty, and this degree has not been furnished. The protection of the innocent is not less important than the punishment of the guilty. A "wave of crime" cannot be stopped by the punishment of those of doubtful guilt. Mere suspicion, however strong, will not support a verdict of guilty. The burden is on the Commonwealth to prove the guilt of the accused beyond a reasonable doubt. *Woods* v. *Commonwealth*, 140 Va. 491, 124 S. E. 458; *Cox* v. *Commonwealth*, 140 Va. 513, 125 S. E. 139, and cases cited.

In the instant case there are some circumstances of suspicion, but there is no satisfactory evidence of the guilt of the accused. Suspicion cannot be substituted for proof, nor supply the place of evidence necessary to overcome the presumption of innocence, and for this reason the judgment of the trial court must be reversed.

This conclusion renders it unnecessary to pass on the rulings of the trial court on the instructions.

The judgment of the trial court will be reversed, the verdict of the jury set aside, and the case remanded to the trial court for a new trial, if the Commonwealth shall be so advised.

*Reversed.*